Nott, J.,
delivered the opinion of the court:
In Wilson’s Case (11 C. Cls. R., 513) these facts appeared:
The case, briefly stated, is this: In 1864 a contractor agreed with the Quartermaster-G-eneral to deliver a large number of mules in the city of Washington. He endeavored to perform according to the very'letter of his contract; but when the mules, which he had brought from Kentucky, reached the confines of the city, the capture of Washington by the forces of Early was imminent. The agents of the contractor sought to enter the city and deliver the mules, but were stopped at the picket-line and turned back, under an order of the military governor of Washington, forbidding all persons to approach the defenses or enter the camps. The agents notified the picket-guard that the mules were for the military service of the United States; that they were to be delivered in Washington under a contract; that the enemy’s cavalry was approaching; and they demanded leave to send one of their number to the Quartermaster-General to procure an order for their admission. The request was refused and the mules were captured, and in part lost to the contractor. The question before the court, was, on whom should the loss fall? The court was satisfied that the contractor was acting according to the letter and spirit of his agreement; that his agents did all that men in such perplexities could reasonably be expected *377 to do, and that the contractor would have fully performed all that his agreement required of him if he had not been directly prevented by the military forces of the United States.
Notwithstanding the peculiar hardships of the case and “with a full appreciation of the good faith of the contractor, his diligence and due observance of all the obligations of his agreement,” the court was satisfied, after mature deliberation, that there was no delivery under the contract and that the loss must be ascribed to the act of the public enemy.
In Salomon’s Case (19 U. S. R., 17) a contractor had failed to deliver corn according to the terms of an express contract. The Supreme Court, however, held that there might be a delivery outside of the requirements of a contract, whiph would cast a liability upon the Government.
It is plain, therefore, that in this case there was not a delivery within the intent of the contract. The case indeed is not as strong as that of Wilson, while it bears a very close resemblance to it. The resulting question is whether the Government treated the occurrence as a delivery and derived a benefit from it within the intent of the decision in Salomon’s case.
In the first place there was an obligation on the part of the Government to support certain Indians at the Fort Peek Agency in the Territory of Montana. That this obligation was not one known to the common law and was in the nature of a gratuity is immaterial. It is enough for the purposes of this suit and of the rights of this party that the Government had assumed such an obligation; and it is enough for the executive officers and the judiciary that it was authorized and required by law. To all intents and purposes the Government was bound to supply those Indians at that time with beef, and these cattle had been purchased or provided for that purpose.
In the second place the agent charged with the duty of procuring and distributing supplies treated the seizure of the cattle by the Indians as a delivery. He certified substantially that the cattle came to their possession; that they were taken by the Indians to their hunting camp, and that they derived apparently a benefit from them as if they had been issued through the agency in the ordinary way. The agent also issued his voucher and charged himself thereby with the cattle, *378 and the only way in which, he could obtain a credit for himself in his accounts was to charge them as an issue to the Indians.
In the third place, the highest executive authority, the Commissioner of Indian Affairs and the Secretary of the Interior took the same view of the case and ratified the action of the agent. Mr. Secretary Schurz speaks of the cattle as having been “taken and consumed by the Indians,” and he directs a settlement of the claimant’s account upon the basis of the contract. Pursuant to instructions the Commissioner of Indian Affairs stated and allowed the account under the contract and referred it to the Second Auditor of the Treasury for settlement with the express direction that it be charged to the appropriation for ‘^Support of Indians, at the Fort Peck Agency 1879.” He also directed that the property be charged to the agent. It is impossible to understand how the Department of the Interior could have charged the amount to the appropriation and the property to the agent unless the Indians who took the cattle and who would have been entitled to receive them in due time through the ordinary official channel had been charged with them as a regular issue.
In the fourth place, the appropriation for the support of these Indians for that year was not exhausted; and on the contrary a balance remained sufficient for the payment of this account, which was turned into the Treasury. If these cattle had not been treated as support for the Indians at that agency; if the agent had purchased other cattle to take their place and the appropriation had thereby been exhausted, the case would be different. But as it is now presented it is apparent that the G-overnment had the benefit of the cattle and that the Indians had the benefit of the cattle, but that the contractor who furnished them has been left without redress.
Finally, this is the view substantially which was taken by two Secretaries of the Interior Department and by the Board of Indian Commissioners and by the Comptroller of the Treasury. The last named says: “I entirely agree with the Secretary of the Interior that the claim is meritorious and ought to be paid, and regret that my judgment leads me to the conclusion that there was not such complete delivery of the cattle as would authorize me in certifying a balance.” He also says that the cattle were intended for “ the very Indians who took and consumed them, though not in a lawful manner.” In these *379 conclusions the Comptroller was undoubtedly right. There was not a technical delivery according to the terms of the contract such as accounting officers could recognize and certify; but there was an acceptance and a benefit derived by the defendants which, upon being judicially ascertained, renders them liable to the other contracting party. When the cattle were taken the defendants in contemplation of law had an election, either to regard the cattle as not having been furnished for the use of the Indians and to furnish them with other cattle, or to treat this as a quasi delivery for the benefit of the Indians and to charge them with the issue accordingly. The responsible agent having charge of the matter elected the latter course. His election was ratified by the executive officers who represent the Government as its authoritative agents, and this election now binds the defendants.
The judgment of the court is that the claimant recover of the defendants the sum of $5,820.20.